UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> STEPHEN B. GRAY, : <br> : <br> Defendant. : <br> : | COMPLAINT <br><br> Civil Action No. 4:13-cv-2186 |

Plaintiff Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges:

## SUMMARY OF THE ACTION

1. This case involves illegal insider trading by Defendant Stephen B. Gray. Gray is the co-founder of a Houston-based investor relations firm, and during all relevant periods, acted as its CEO and managing partner. In the course of his duties at the firm, Gray learned material, nonpublic information about firm clients and traded on that information for personal profit.

2. Gray traded ahead of both positive and negative client news, buying common stock, and call and put options, in at least six public companies. Between May 2011 and May 2012, Gray made profits of at least $278,000 and avoided losses of at least $35,000 from his illegal trading.

3. By reason of these activities, Defendant Gray violated Section 10(b) [15 U.S.C. § 78j(b)] of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) [15 U.S.C. § 77q(a)] of the Securities Act of 1933 ("Securities Act"). Accordingly, the Commission seeks: (i) a permanent injunction enjoining Defendant from further violations of these provisions of the federal securities laws; (ii) an order

barring Defendant from serving as an officer or director of a public company; (iii) disgorgement of the profits gained and losses avoided as a result of his insider trading, plus prejudgment interest; and (iv) the imposition of civil monetary penalties.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §77t(b) and 77t(d)]. The Commission seeks the imposition of civil penalties pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] and Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)].

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa]. Defendant, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint.

8. Venue is proper because the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the Southern District of Texas.

## DEFENDANT

9. Stephen B. Gray, age 56, is a resident of Houston, Texas. During the period of his illegal trading, Gray was the CEO, Managing Partner and a member of an investor relations firm that provided services to various publicly-traded companies. From 2000 to 2001, prior to joining the firm, Gray was the CEO of ION Networks, Inc., a public company that traded on the Nasdaq.

## STATEMENT OF FACTS

*A.    Gray's Access to Firm Clients' Material, Nonpublic Information*

10.    Gray's investor relations firm assisted its clients in drafting and publishing announcements of quarterly and annual earnings, mergers and acquisitions, and other material events.  As a result, at all times, the firm and its personnel, including Gray, had access to and possessed highly material, nonpublic information about firm clients and their securities.

11.    Employees at the firm freely shared confidential client information with each other and with Gray, with the expectation and understanding that the information would be kept confidential.  Employees' offices were in close proximity to each other, and confidential information was freely discussed within the office and easily overheard.  Employees often asked Gray for advice on press releases, based both upon his experience as the former CEO of a public company, and his status as CEO of the investor relations firm.  Gray also asked employees about forthcoming material transactions or announcements, before they became public.  Gray sometimes met directly with clients, and discussed confidential information with them.  Gray also had full access to, and administrative responsibility for, the firm's shared computer network drive, which included drafts and final versions of all relevant press releases.

*B.    Gray Had Duties to the Firm and To Its Clients Not To Trade On Material, Nonpublic Information*

12.    Gray's firm had a standard client agreement that included a confidentiality provision in which the firm agreed to protect client information and use it solely for business purposes.  The firm had entered into such agreements with all relevant clients prior to Gray's trading.  Gray, as CEO and a member/partner of the firm, was aware of and bound by these agreements.

13. In addition, during the relevant period, the firm had a Business Conduct and Ethics Code (the "Code") and Statement of Policy Regarding Securities Trades by [Firm] Personnel (the "Trading Policy"). The Trading Policy discussed relevant federal securities laws that prohibit insider trading, and prohibited trading by firm personnel when in possession of "material non-public information relating to any of [the firm's] clients and/or their supplier." Gray not only knew of the policies – *he drafted them*. Moreover, he was personally responsible for ensuring firm employees received and signed copies of each.

14. The firm's policies did not just prohibit illegal trading. Rather, during the relevant period, Gray and other firm personnel were prohibited from trading in *any* client securities, at *any* time. Indeed, as part of the firm's standard pitch to prospective clients, which were regularly attended by Gray, firm representatives emphasized to clients that its personnel would not trade client securities.

C. ***Gray's Trading History***

15. Gray opened a TD Ameritrade account in September 2009 (the "TD Account"). The TD Account was Gray's only trading account. Gray borrowed funds from his whole life insurance policy to fund his trading activity. Despite the firm's policies, the overwhelming majority of Gray's trades in the TD Account involved securities of the firm's clients. Gray did not disclose his trades or his intention to trade to the firm or its clients.

16. From 2010 until September 2011, Gray primarily traded in the common stock of firm clients, sometimes holding the securities for months at a time. Starting in September 2011 and continuing to May 2012, however, Gray began engaging in more risky and lucrative short-term options trades. For example, in several instances Gray purchased out-of-the-money, short-term call and put options contracts, some of which expired less than two weeks after purchase.

17. A "call option" is a securities transaction that gives the holder the right to buy a certain quantity of an underlying security at a specified price up to a specified expiration date. A call option gives the purchaser the right to "call in" or buy stock, and profit is made on a call option when the underlying stock increases in price.

18. A "put option," on the other hand, gives the holder the right to sell a certain quantity of an underlying security at a specified price up to a specified expiration date. A put option gives the purchaser to "put to" or sell stock, and profit is made on a put option when the underlying stock decreases in price.

19. Without access to nonpublic information, trades in options – particularly, short-term options – can carry significant risk, because the trader is betting that the common stock underlying the options will increase significantly (if buying call options) or decrease significantly (if buying put options), prior to expiration. If the stock does not meet the target price by the expiration date, the options expire out of the money and the trader loses all of the money he paid to purchase the option. The shorter the term of the option, the riskier it is, because the common stock has less time to reach the target price.

20. But because Gray was in possession of material nonpublic information, he knew that the options he acquired were highly likely to move "in the money" as the result of the client announcements, and that he would be able to exercise or sell the options for a significant profit.

**D.** *Gray Acquires and Trades on Material Nonpublic Information*

21. During the course of his employment with his firm, and while in possession of material, nonpublic information about firm clients, Gray traded in violation of his duties to the firm and its clients. With respect to each of the press releases discussed below, Gray obtained advance knowledge of material information that would be detailed in press releases issued by

firm clients. Gray then traded while in possession of such material information before the information became public.

### a. *Superior Energy/Complete Production Merger*

22. On October 10, 2011, firm client Superior Energy Services, Inc. ("SPN") issued a press release announcing that it was acquiring and merging with Complete Production Services, Inc. ("CPX"). The merger deal included a 29% premium for CPX stock, and immediately following the announcement, CPX's stock price increased 31%. Gray was in possession of the material information before it was publicly announced in the press release, and traded in breach of his duties to his firm, SPN and CPX.

23. SPN worked with Gray's firm during September and October 2011 in preparation for the public announcement of the merger. Gray knew about the merger by at least September 27, when the firm agreed via email to be bound by the confidentiality agreement in place between SPN and CPX personnel and representatives. From September 29 to October 6, before news of the merger became public on October 10, Gray acquired 36,500 CPX call option contracts, 33,000 of which expired in October with strike prices of $25 and $30, and 3,500 of which expired in November with a strike price of $22.50. All of these options were out-of-the-money when purchased (meaning that the strike price was more than market price), and the October options had the shortest terms available. CPX's stock price following the announcement increased 31%, and Gray immediately sold his options for a profit of $40,575.

### b. *Powell Announces Restatement*

24. On November 8, 2011, Powell Industries ("POWL") issued a press release announcing that its financial statements for the second and third quarters of 2011 should no longer be relied upon and would be restated. Immediately after POWL issued its press release,

its stock price declined 22%. Gray was in possession of the material information before it was publicly announced in the press release, and traded in breach of his duties to his firm and POWL.

25. Gray's firm worked with POWL on the announcement, and sent a draft of the release to POWL as early as October 23. Between October 18 and November 3, while in possession of material, nonpublic information concerning POWL's upcoming announcement, Gray purchased 15,000 POWL put options expiring in November with a strike price of $35. All of these options had the shortest term available. Following POWL's November 8 announcement, Gray immediately sold his options for a profit of $82,570.

### c. Mitcham Announces 1Q 2011 Record Earnings

26. On June 6, 2011, Mitcham Industries ("MIND") issued a press release announcing record earnings for the first quarter of 2011. Immediately after MIND issued its earnings release, its stock price increased 12%. Gray was in possession of the material information before it was publicly announced in the earnings release, and traded in breach of his duties to his firm and MIND.

27. Gray's firm worked with MIND on the release during May and June, and sent a draft release to MIND on May 17. On May 24, Gray created an electronic calendar appointment for himself titled: "Look at MIND to purchase w/ results being announced June 6th…revenues up 61% eps doubled to .$56/share..etc..how does outlook look??" The figures noted by Gray were nearly identical to those ultimately disclosed in MIND's June 6 press release. From May 26 to June 1, Gray purchased 6,000 shares of MIND. After the release, Gray sold all of his shares for a profit of $6,043.

### d. *Mitcham Announces 3Q 2011 Record Earnings*

28. On December 6, 2011, MIND again announced record earnings, this time for the third quarter 2011. Following MIND's announcement, its share price increased 20%. Gray was in possession of the material information before it was publicly announced in the earnings release, and traded in in breach of his duties to his firm and MIND.

29. Gray's firm and MIND began working on the release on November 9, and met on November 21 for a "quarterly prep meeting." From November 23 to December 1, Gray purchased 9,000 MIND call options expiring in December with strike prices of $12 and $15, as well as 5,000 shares of common stock. The $15 call options were out-of-the-money when purchased, and all had the shortest term available. Following the announcement, Gray immediately sold his MIND options and shares for a profit of $64,753.

### e. *C&J Energy Announces New Drilling Contract and Higher Earnings*

30. On October 24, 2011, C&J Energy Services, Inc. ("CJE") announced in a press release that it was signing a new contract for its hydraulic fracturing fleet. Gray's firm began working with CJE on the release as early as September 30. At the same time, Gray's firm was also helping CJE prepare its third quarter 2011 earnings release, and on November 9, CJE announced a higher than expected increase of net income for the third quarter 2011.

31. On October 19, Gray purchased 2,000 CJE call options expiring in December, with a strike price of $20. All of these options were out-of-the-money when purchased.

32. On October 22, Gray was copied on a draft of the October 24 release by a firm employee, to which he responded via e-mail: "Is this the big deal u told me they had in the works?" Gray was in possession of the material information before it was announced in the press release, and traded in breach of his duties to his firm and CJE.

33. From October 31 to November 1, Gray purchased another 10,000 CJE call options expiring in November. All of these options were out-of-the-money when purchased, and had the shortest term available. When CJE's stock price surpassed the strike prices of Gray's 12,000 CJE call options prior to the November 9 earnings release, Gray sold the options on November 8 for a profit of $18,030.

34. On November 9, just 20 minutes before CJE's release was published, Gray used proceeds of the November 8 sale to purchase another 10,000 CJE call options expiring 10 days later. Immediately after CJE issued the November 9 earnings release, its stock price increased 9%. On November 10, Gray sold his remaining CJE options on November 10 for a profit of $3,420.

*f. Men's Wearhouse Announces Higher Earnings Per Share*

35. On May 5, 2011, The Men's Wearhouse, Inc. ("MW") issued a press release announcing higher than expected earnings per share for its quarter ending April 30, 2011. Immediately after MW issued its press release, its stock price increased nearly 16%. Gray was in possession of the material information before it was publicly announced in the press release, and traded in breach of his duties to his firm and MW.

36. On April 29, Gray made an electronic calendar appointment for himself, with the subject: "Buy MW stock ahead of early June earnings release." On April 30, Gray created another appointment with the subject: "Buy MW stock??" On May 3 and 4, Gray purchased 4,323 MW common shares. Following the announcement, and Gray sold his shares on May 5 for a profit of $17,397.

### g. *MRC Announces Sales and Earnings Increases*

37. On Friday, May 4, 2012, MRC Global, Inc. ("MRC") issued a press release announcing a 39% increase in sales for its first quarter, as well as a 92% increase in EBITDA. Immediately after MRC issued its press release, its stock price increased 2%. Gray was in possession of the material information before it was publicly announced in the press release, and traded in breach of his duties to his firm and MRC.

38. In late April, Gray's firm and MRC exchanged drafts of the release and prepared for the related investor call. Gray knew of the upcoming release as early as April 27, when he was copied on a draft of the May 4 release. On May 1, Gray purchased 2,000 out-of-the-money MRC call options expiring June 16, with a strike price of $20. Gray sold his options on May 7, the Monday following the release, for a profit of $1,100.

### h. *Hyperdynamics Announces Letter of Intent*

39. Gray worked particularly closely with Hyperdynamics Corp. ("HDY"). Gray was a regular participant in the weekly conference call between his firm and HDY in which upcoming disclosures and other events were discussed.

40. On May 9, 2011, HDY issued a press release announcing that it signed an extension of a Letter of Intent related to drilling activities off the coast of the Republic of Guinea. Immediately after the press release was issued, HDY's stock price increased 6%. Gray was in possession of the material information before it was publicly announced in the press release, and traded in breach of his duties to his firm and HDY.

41. On May 5, Gray purchased 27,323 shares of HDY common stock. Following the May 9 announcement, Gray sold all his HDY shares for a profit of $6,832.

### i. *Hyperdynamics Announces Net Loss and Drilling Delays*

42. After the close of trading on November 8, 2011, HDY filed its Form 10-Q announcing that its net loss for 3Q 2011 would be 65% greater than the prior year period. HDY also issued a press release that discussed the net loss and announced that the objective horizons for HDY's well offshore the Republic of Guinea (HDY's only well) had not been met. Immediately after the Form 10-Q and press release were issued, HDY's stock price declined 25%. Gray was in possession of the material information before it was publicly announced in the Form 10-Q and press release, and traded in breach of his duties to his firm and HDY.

43. At least as early as October 31, Gray personally participated in a conversation with HDY management about the contents of its forthcoming Form 10-Q and press release, and described the conversation in an e-mail to his colleagues. On November 2, before the negative news was made public by HDY, Gray sold HDY shares he had purchased in October. On November 8, immediately prior to the announcement, Gray purchased 500 HDY put options expiring that month with strike prices of $5 and $6. At the time of purchase, the $5 options were out-of-the-money and all of the options had the shortest term available. After the announcement, Gray immediately sold his options for a profit of $37,500. As a result of his November 2 sale, he also avoided losses of $35,026.

### E. *Gray's Cumulative Profits and Losses Avoided*

44. Through the illegal trading described in paragraphs 22 through 43 above, Gray made at least $278,000 in profits and avoided losses of at least $35,000.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations by Defendant of Exchange Act Sections 10(b) and Rules 10b-5 Promulgated Thereunder

45. Paragraphs 1 through 44 are realleged and incorporated by reference.

*SEC v. Stephen B. Gray*        Page 11
COMPLAINT

46. Defendant, by engaging in the conduct described above, directly and indirectly, in connection with the purchase and sale of securities, and by use of the means and instrumentalities of interstate commerce and of the mails, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

47. Defendant intentionally, knowingly or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

48. By reason of his foregoing acts and practices, Defendant violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM
### Violation by Defendant of Securities Act Section 17(a)

49. Paragraphs 1 through 44 are realleged and incorporated by reference.

50. Defendant, by engaging in the conduct described above, directly and indirectly, in connection with the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or of the mails, has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or coursed of business which operated or would operate as a fraud or deceit upon the purchasers of the securities offered or sold.

51.   By reason of the foregoing, the Defendant, directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. § 77q], and is likely to commit such violations in the future unless enjoined from doing so.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(i)   Permanently enjoining Defendant from violating Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act, and Rule 10b-5 [17 C.F.R. § 240.10b-5 thereunder, and Section 17(a) [15 U.S.C. § 77q(a)] of the Securities Act.

(ii)   Ordering that Defendant be permanently prohibited from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 [15 U.S.C. § 78l] of the Exchange Act or that is required to file reports pursuant to Section 15(d) [15 U.S.C. § 78o(d)] of the Exchange Act;

(iii)   Ordering Defendant to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(iv)   Ordering Defendant to pay civil monetary penalties pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] and Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] for his violations of the federal securities laws as alleged herein; and

(v)   Granting such other relief as this Court may deem just and appropriate.

July 26, 2013								Respectfully submitted,

*/s/ Jennifer D. Brandt*
_____
Jennifer D. Brandt
Attorney-in-Charge
S.D. Tex. Bar No. 37943
Texas Bar No. 00796242
Todd B. Baker
S.D. Tex. Bar No. Pending
Texas Bar No. 24031715
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, 18th Floor
Fort Worth, TX  76102-6882
Phone: (817) 978-6442 (jb)
Fax: (817) 978-4927
*brandtj@sec.gov*
ATTORNEYS FOR PLAINTIFF